UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOHN W.,[1]

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

20-CV-130-LJV
DECISION & ORDER

---

On January 31, 2020, the plaintiff, John W. ("John"), brought this action under the Social Security Act ("the Act"). He seeks review of the determination by the Commissioner of Social Security ("Commissioner") that he was not disabled. Docket Item 1. On November 9, 2020, John moved for judgment on the pleadings, Docket Item 12; on December 15, 2020, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 13; and on January 15, 2021, John replied, Docket Item 15.

For the reasons stated below, this Court grants John's motion in part and denies the Commissioner's cross-motion.[2]

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, this Court will identify any non-government party in cases filed under 42 U.S.C. § 405(g) only by first name and last initial. Standing Order, Identification of Non-government Parties in Social Security Opinions (W.D.N.Y. Nov. 18, 2020).

[2] This Court assumes familiarity with the underlying facts, the procedural history, and the ALJ's decision and will refer only to the facts necessary to explain its decision.

## **STANDARD OF REVIEW**

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id*. This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the [Administrative Law Judge ('ALJ')] applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## **DISCUSSION**

John argues that the ALJ erred in finding his lumbar degenerative disc disease and borderline intellectual functioning to be non-severe impairments. Docket Item 12-1

at 8-9.  This Court agrees that the ALJ erred and, because that error was to John's prejudice, remands the matter to the Commissioner.

In denying John's application, the ALJ analyzed his claim under the Social Security Administration's five-step evaluation process for disability determinations.  *See* 20 C.F.R. § 404.1520.  At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful employment.  *Id.* § 404.1520(a)(4)(i).  If so, the claimant is not disabled.  *Id.*  If not, the ALJ proceeds to step two.  *Id.* § 404.1520(a)(4).

At step two, the ALJ decides whether the claimant is suffering from a severe impairment or combination of impairments.  *Id.* § 404.1520(a)(4)(ii).  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  *Id.* §§ 404.1520(c), 416.920(c).  Social Security regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs," including:  "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers[,] and usual work situations"; and "[d]ealing with changes in a routine work setting."  *Id.* §§ 404.1521(b), 416.921(b).[3]  If there is no severe impairment or combination of impairments, the claimant is not disabled.  *Id.* § 404.1520(a)(4)(ii).  If there is a severe impairment or combination of impairments, the ALJ proceeds to step three.  *Id.* § 404.1520(a)(4).

---

[3] These sections were amended, effective March 27, 2017.  Because John applied for disability benefits starting on January 8, 2016—that is, before the date the changes became effective—his claim is governed by the prior regulations.

At step three, the ALJ determines whether a severe impairment or combination of impairments meets or equals an impairment listed in the regulations. *Id.* § 404.1520(a)(4)(iii). If the claimant's severe impairment or combination of impairments meets or equals one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that no severe impairment or combination of impairments meets or equals any in the regulations, the ALJ proceeds to step four. *Id.* § 404.1520(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See id.* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and non-severe medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See id.* § 404.1545. After determining the claimant's RFC, the ALJ completes step four. *Id.* § 404.1520(e). If the claimant can perform past relevant work, the claimant is not disabled and the analysis ends. *Id.* § 404.1520(f). But if the claimant cannot, the ALJ proceeds to step five. *Id.* §§ 404.1520(a)(4)(iv); 404.1520(f).

At the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(a)(4)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Here, the ALJ denied John's claim at step two—an outcome reserved for only "the weakest of cases." See Robert M. v. Saul, 2021 WL 780259, at *2 (W.D.N.Y. Mar. 1, 2021) (citing Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995)); see also Howard v. Comm'r of Soc. Sec., 203 F. Supp. 3d 282, 295 (W.D.N.Y. 2016) ("[T]he severity determination . . . is intended to 'increase[] the efficiency and reliability of the disability evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled.'") (citing Bowen, 482 U.S. at 153). In fact, a claimant's "evidentiary requirement [at step 2] is de minimis." Robert M., 2021 WL 780259, at *2. A finding of "not severe is only appropriate where the medical evidence establishes only a slight abnormality [that] would have no more than a minimal effect on an individual's ability to perform basic work activities." Id. (citations and marks omitted).

The ALJ found that John had several medically determinable impairments—degenerative disc disease of the lumbar spine, depressive disorder, anxiety disorder, obesity, and substance abuse disorder—but that none of these impairments was severe. Docket Item 6 at 16. In support of his decision, the ALJ found that John had "no medically determinable impairment of learning disorder or any cognitive or intellectual disorder." Id. at 18. And to reach that conclusion, the ALJ relied heavily—indeed, perhaps exclusively—on the opinion of a consultative psychologist, Susan Santarpia, Ph.D. See id.

Dr. Santarpia examined John only once. See id. at 270. Based on that single examination, Dr. Santarpia opined that John could "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and

5

concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress within normal limits." *Id.* at 272.  She diagnosed John with "[a]djustment disorder with depressed mood" and noted that John did not report any medical diagnoses to her.  *Id.*  Dr. Santarpia "[e]stimated" John's cognitive functioning "to be in the average range of ability" and found that his "[g]eneral fund of information was appropriate to experience."  *Id.*  And she reported that John "graduated from high school and . . . was in a regular education classroom setting throughout h[is] schooling."  *Id.* at 270.

The ALJ afforded Dr. Santarpia's opinion "significant weight" because Dr. Santarpia "is familiar with Social Security's rules and regulations regarding mental impairments and disability"; she "conducted a thorough mental status exam whose findings support her conclusions"; and her "assessment is [] consistent with the record overall."  *Id.* at 21.  In reaching that conclusion, however, the ALJ ignored significant evidence to the contrary.

For example, contrary to the ALJ's assertion that Dr. Santarpia's opinion is "consistent with the record overall," *id.*, the record includes persuasive evidence that contradicts Dr. Santarpia's findings that John had "average" cognitive functioning and that he "was in a regular education classroom setting throughout h[is] schooling," *see id.* at 270.  In his disability reports, John noted that he had a "learning disability since [he] was a kid" and that he attended special education classes at South Park High School from 1983 to 1987.  *Id.* at 203, 212.  John's school records corroborated that.  *See id.* at 186 (showing IQ of 77 and grade as "EMR," presumably "educable mentally retarded,"

6

*see infra* note 5, at South Park High School in 1986); *id.* at 187 (IQ of 69 in 1983); *id.* at 188 (IQ of 74 in 1978); *id.* at 189 (IQ of 74 in 1975).  Indeed, his third-grade record commented "EDUC. RETARD."[4] and "CAN NOT [sic] READ," *id.* at 189, and his ninth-grade record noted that John was "suspected handicapped" and recommended "EMR classes,"[5] *id.* at 187.

For these reasons, the state-reviewing psychologist, L. Blackwell, Ph.D., found that John had the "medically determinable impairment" of "[b]orderline [i]ntellectual [f]unctioning," which he opined was a "[s]evere" impairment.  *Id.* at 82.  Of course, the ALJ was permitted to choose between Dr. Blackwell's and Dr. Santarpia's opinions; in fact, that is what the ALJ is charged to do.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  But in making that choice, the ALJ was required to explain the reason for it, *see* 20 C.F.R. § 404.1527(c), in a way that allows this Court to "assess the validity of the [ALJ's] findings and afford[s the] claimant meaningful judicial review," *see Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004)).  Moreover, the ALJ cannot simply cherry pick an opinion and ignore significant evidence to the contrary.  *Thomas v. Berryhill*, 337 F. Supp. 3d 235, 244 (W.D.N.Y. 2018).  The ALJ erred by violating both those rules here.

---

[4] The Court recognizes that this label is offensive but chooses to repeat it because it was the label used at the time of John's school records and is quoted verbatim in John's brief.  *See* Docket Item 15 at 3.

[5] EMR presumably means "educable mentally retarded," which, according to the American Psychological Association, is a "rarely used term [in special education] for a category of people with mild or high-moderate mental retardation (IQ 50 to 70 or 80) who are capable of achieving approximately a fifth-grade academic level."  *APA Dictionary of Psychology*, American Psychological Association, https://dictionary.apa.org/educable-mentally-retarded (last visited June 15, 2021).

The ALJ gave Dr. Blackwell's opinion only "little weight" because "[t]he record contains no medical diagnosis of a learning disorder or of borderline intellectual functioning."  Docket Item 6 at 21.  But that is plainly incorrect:  Dr. Blackwell rendered such a diagnosis, albeit based on a review of the records.  *Id.* at 82.  And as noted above, John's IQs were between 69 and 77 for more than a decade,[6] *id.* at 186-89, and his school records indicated that he was suspected to be "handicapped" and likely was intellectually disabled, *see id.* at 187, 189.

Along the same lines, the ALJ's reasons for crediting Dr. Santarpia's opinion—that it was "consistent with the record overall and support of [sic] no severe mental impairments," *id.* at 21—were both conclusory and incorrect.  The ALJ did not explain why he believed Dr. Santarpia's opinion to be "consistent with the record overall," and, in fact, it was not—at least not with the school records noted above and with Dr. Blackwell's diagnosis.

---

[6] All John's IQ scores fall within the range of "mild or high-moderate mental retardation (IQ 50 to 70 or 80)" as described by the American Psychological Association.  *See supra* note 5.  Moreover, to meet the listing criteria of 12.05—"which sets forth the conditions under which a person *is intellectually disabled*" by definition for Social Security purposes, *Burnette v. Colvin*, 564 F. App'x 605, 607 (2d Cir. 2014) (emphasis added)—a claimant must have a "valid verbal, performance, or full scale IQ of 60 through 70," in addition to meeting other requirements, 20 C.F.R. Pt. 404 Subpt. P, App. 1, 12.05(C).  John's lowest IQ score was within that range—and the rest only slightly above it.  "When there are multiple IQ tests, the lowest IQ score should be used unless there is some indication that the score is invalid."  *Kennerson v. Astrue*, 2012 WL 3204055, at *8 (W.D.N.Y. Aug. 3, 2012).  So John may well meet the criteria for intellectual disability under the Act.  Regardless, John was at best "[b]orderline," *contra* Docket Item 6 at 70, and certainly had more than a "slight" or "*de minimis*" impairment, *see Robert M.*, 2021 WL 780259, at *2.  Because the ALJ found John not to be disabled at step 2, he did not evaluate whether John met the listing criteria of 12.05 at step 3, nor did he weigh whether John's learning and mental challenges, alone or in combination with his other impairments, rendered him disabled.

Because the record included at least some evidence supporting a learning or other intellectual disorder that well might "significantly limit[] [John's] . . . mental ability to do basic work activities," see 20 C.F.R. §§ 404.1520(c), 416.920(c), Dr. Santarpia's opinion does not provide substantial evidence for finding John's mental impairments to be non-severe.[7]  And Dr. Blackwell's opinion to the contrary underscored the ALJ's error.

At the very least, the inconsistency between Dr. Santarpia's opinion on the one hand, and John's school records and Dr. Blackwell's opinion on the other, evidenced a gap in the record that the ALJ was obliged to fill.  Stated another way, the record is at best inconclusive about whether John indeed was enrolled in special education classes, had a learning disorder, or was otherwise mentally and intellectually challenged in a significant way.  "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 686 F.2d 751, 755 (2d Cir. 1982)); *see also Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (same); 42 U.S.C. § 423(d)(5)(B) (requiring that the

---

[7] Although the opinion of a consultative examiner can in some circumstances provide substantial evidence in support of an ALJ's opinion, *see Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983), the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," a "concern [that] is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health."  *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019) (first quoting *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (per curiam)).  That admonition seems particularly appropriate here where Dr. Santarpia's "[e]stimat[ion]" that John had "average" cognitive functioning, Docket Item 6 at 272, as well as her finding that he was not in special education classes, *id.* at 270, are contradicted by the record, *see id.* at 186-89.

Commissioner, before rendering any eligibility determination, "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination"). Thus, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.'" *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).

So before rejecting Dr. Blackwell's opinion and finding that John did not have a learning disorder or other severe mental impairment at step two, the ALJ should have sent John for an intellectual functioning exam or otherwise developed the record. *See Tumpower v. Colvin*, 2015 WL 162991, at *14 (W.D.N.Y. Jan. 13, 2015) (remanding "where the ALJ rejected Dr. Newman's opinion in large part because the ALJ found that it was incomplete [and] the ALJ had a duty to develop the record by re-contacting Dr. Newman for clarification regarding [the] foundation for [the] opinion") (citations omitted); *see also Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (explaining that before an ALJ may deny a claimant's application, he must "confront the evidence in [the claimant's] favor and explain why it was rejected"). The failure to do at least that was error as well.

And the ALJ's errors were not harmless. Because the ALJ found that John did not have any severe impairments, he concluded that John was not disabled without any further analysis. Had the ALJ found any severe impairment, he would have been required to formulate a residual functional capacity that "fully considered" the combined effect of John's many impairments—both severe and non-severe. *See Guerra v.*

*Comm'r of Soc. Sec.*, 2018 WL 3751292, at *3 (W.D.N.Y. Aug. 7, 2018).  In other words, the ALJ screened John's case as among the very "weakest," *see Robert M.*, 2021 WL 780259, at *2, not even determining what John could and could not do despite the several impairments that the ALJ himself acknowledged.  Remand therefore is required so the ALJ can further develop the record and reevaluate John's application in light of the expanded record.[8]

## **CONCLUSION**

The Commissioner's motion for judgment on the pleadings, Docket Item 13, is DENIED, and John's motion for judgment on the pleadings, Docket Item 12, is GRANTED in part and DENIED in part.  The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.


SO ORDERED.

Dated:      June 16, 2021
            Buffalo, New York


                                            */s/ Lawrence J. Vilardo*
                                            LAWRENCE J. VILARDO
                                            UNITED STATES DISTRICT JUDGE

---

[8] The Court "will not reach the remaining issues raised by [John] because they may be affected by the ALJ's treatment of this case on remand."  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003); *see also Bonet ex rel. T.B. v. Colvin*, 2015 WL 729707, at *7 (N.D.N.Y. Feb. 18, 2015).